# SUPREME COURT OF TENNESSEE

### FOR THE

### EASTERN DIVISION

KNOXVILLE, SEPTEMBER TERM, 1923.

*(Continued from Vol. 148.)*

NICKEY BROS., INC., *v.* LONSDALE MFG. CO.

*(Knoxville.* September Term, 1923.)

1. **CORPORATIONS.** Negotiable Instruments Act applies to public and corporate bonds.

The Uniform Negotiable Instruments Act applies to public and corporate bonds as well as to bills, notes, and checks. (*Post, p.* 7.)

Acts cited and construed: Acts 1899, ch. 94.

Case cited and approved: Gilley v. Harrell, 118 Tenn., 122.

Code cited and construed: Sec. 1957 (1858).

2. **CORPORATIONS.** Bank accepting corporation bonds as collateral to corporation's president's loan "holder in due course."

Corporation bonds being negotiable and within Uniform Negotiable Instruments Act, where bank, believing that bonds deposited by president of a corporation as security for a personal loan belonged to him, made the loan on the faith of such bonds, it became a holder in due course. (*Post, pp.* 8-17.)

Nickey Bros. v. Lonsdale Mfg. Co.

Acts cited and construed: Acts 1899, ch. 94.

Cases cited and approved: Merritt v. Duncan, 54 Tenn., 164; Hunt v. Sanford, 14 Tenn., 387; Van Wyck v. Nowell, 21 Tenn., 195; Ryland v. Brown, 39 Tenn., 273; Gill v. Cubitt, 3 Barn. & Cress, 446; Cheever v. P., S. & L. E. R. Co., 150 N. Y., 65; Magee v. Badger, 34 N. P., 249; Am. Ex. Nat. Bank v. N. Y. Belting, etc., Co., 148 N. Y., 705; Knox v. Eden Musee American Co., 148 N. Y., 454; Canajoharie Nat. Bank v. Diefendorf, 123 N. Y., 202; Vosburgh v. Diesendorf, 119 N. Y., 357; Jarvis v. Manhattan Beach Co., 148 N. Y., 652.

Cases cited and distinguished: Bank v. Butler, 113 Tenn., 580; Swift v. Smith. 102 U. S., 442; Murray v. Lardner, 2 Wall., 710; Montvale v. People's Bank, 74 N. J. Law, 464.

---

FROM KNOX.

---

Appeal from the Chancery Court of Knox County.— HON. CHAS. HAYS BROWN, Chancellor.

FRANTZ, MCCONNELL & SEYMOUR, for Nickey Bros.

CATES, SMITH, TATE & LONG, for Mfg. Co.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

The original bill in this cause was filed, and sustained, as a general creditors' bill for the purpose of administering the affairs of the defendant, Lonsdale Manufacturing Company, as an insolvent corporation.

Pending the suit the Union National Bank of Knoxville filed its petition in the cause, alleging that it held

four bonds of the Lonsdale Manufacturing Company for $500 each, and sought a decree for the face value of said bonds with interest and attorney's fees, as provided for in said bonds, and to have said decree satisfied out of the proceeds derived from the sale of the property, conveyed in trust, to secure same.

The relief prayed for was granted by the chancellor, and the receiver of the defendant company has appealed to this court and has assigned errors.

The pertinent facts as to the transaction are substantially as follows:

On January 31, 1922, the defendant company issued $75,000 of bonds, secured by a deed of trust, to the Fidelity Trust Company, trustee, on certain property owned by it. Said bonds bore interest at the rate of eight per cent. per annum, and provided for ten per cent. attorney's fees if placed in the hands of an attorney for collection.

The trust deed securing said bonds contained the following provision:

"It is hereby agreed that the said issue of $75,000 of bonds hereby provided for shall upon the signing and execution thereof or as soon thereafter as practicable be duly certified by said Fidelity Trust Company, trustee, and delivered by it to the president of this company. . . . And such certificate of said trustee shall be conclusive evidence that the bonds so certified have been duly issued hereunder and are entitled to the benefit of the trust hereby created."

In authorizing the issuance of said bonds the stockholders passed the following resolution:

"Be it further resolved that the board of directors be and it is hereby authorized to sell and dispose of said

bonds upon such terms and conditions as may seem to it advisable and for the best interests of the company."

The board of directors thereupon conferred the following authority upon the president:

"Upon motion duly seconded and unanimously passed it was ordered that the president be authorized to dispose of said bonds at not less than par through such trust company or their agents and upon such terms as the president might deem advisable and for the best interests of the corporation, the proceeds of said bonds to be used for corporate purposes only."

Said bonds were duly certified by the trustee and delivered into the hands of L. H. Stone, the president of the defendant corporation. Mr. Stone was unable to sell the bonds, but from time to time hypothecated portions of said bonds for the purpose of securing funds with which to meet the obligations of the company.

At the time of the filing of the bill in this cause in May, 1922, $42,000 of the bonds had been disposed of in the manner indicated.

It may be stated at this point that the property securing said bonds was sold for $24,000, so that after adding interest and attorney's fees the holders of same will probably receive about fifty cents on the dollar from the trust fund. These bonds were payable to bearer and passed by mere delivery.

Four of these bonds of $500 each were turned over to the petitioner, Union National Bank, as collateral security to a loan made by petitioner bank to Mr. Stone on April 17, 1922.

The defendant company, being in financial straits and not having sufficient funds to meet its pay roll, on April

15, 1922, through its president, Mr. Stone, applied to petitioner bank for a loan to meet its pay roll and other pressing obligations, which was declined.

The officers of the bank considered Mr. Stone a responsible man of wealth and agreed to make the loan to him individually. Mr. Stone thereupon executed his thirty-day note to the bank for $1,000, with C. B. Johnson as indorser thereon.

On the same day Mr. Stone used a part of said fund in paying for some glass, which had been shipped to the company C. O. D., and which it needed badly to use in the manufacture of some of its products, and the balance he loaned to the company, taking its demand note for same payable to himself. This was on Saturday. On Monday following (April 17th) Stone made another individual loan from the bank evidenced by the following note, to-wit:

"Sixty days after date we or either of us promise to pay to the order of the Union National Bank of Knoxville $1,000 at the banking house of said bank in Knoxville, Tenn., for value received, having deposited with said bank as collateral security for the payment of this note, and of any other note, claim or indebtedness now or hereafter held against me by said bank, $2,000 first mortgage bonds Lonsdale Manufacturing Company (bonds No. 128, 129, 130, 131, $500 each), which I hereby authorize said bank to sell, without notice, either at public or private sale on the nonperformance of this promise applying the net proceeds thereof to the payment of this note, with interest and any excess after the payment hereof to the payment of any other note, claim or indebtedness then held

against me by said bank, whether due or not due, as said bank may elect; and accounting to me for the surplus, if any."

Stone also loaned the proceeds derived from the last-named loan to the defendant company, for which it executed its demand note on April 18th.

On June 16, 1922, the note of April 17, 1922, carrying as collateral security the $2,000 of bonds in question, having matured, the Union National Bank elected, as it had the right to do under the written agreement contained in the note of April 17th, to pledge the surplus collateral to the payment of the note of April 16th. This was accomplished by consolidating the two notes and taking a new note, which contained exactly the same provision with respect to the collateral and the application of the surplus to any other indebtedness as has been set out above.

Subsequent to their execution Mr. Stone negotiated the two notes, which the company executed to him, to the City National Bank, and a decree has been entered in this cause in favor of said bank and against the company for the face value of said notes, with interest and attorney's fees.

It will thus be seen that by virtue of the decree on the note just referred to, and the decree on the bonds in favor of petitioner bank, the company will have to pay the same debt twice.

The first error assigned by the defendant is as follows:

"The chancellor erred in holding and decreeing that the petitioner, Union National Bank, was the legal holder of said bonds for value and entitled to realize thereon in this case, and in rendering a decree against the defendant,

Lonsdale Manufacturing Company, for the principal, interest, and attorney's fees thereon in the sum of $2,448, together with the costs of the cause, or for any amount whatsoever. The chancellor should have held and decreed that the petitioner, Union National Bank, was not the holder of said bonds in due course and for value, and was not entitled to realize thereon in this case, and should have decreed a dismissal of the petition filed therein by the Union National Bank."

By this assignment of error the question is raised as to whether the bank is a holder in due course.

The Uniform Negotiable Instruments Act (Laws 1899, chapter 94) applies to public and corporate bonds as well as to bills, notes, and checks.

Mr. Dolle, in his work on the Law of Business Paper and Securities (in reference to the Uniform Negotiable Instruments Law) on page 10, says:

"Although it is applicable to all forms of negotiable instruments, the act has particular reference to promissory notes, bills of exchange and checks, these being the principal form of commercial paper and the three with which business men most frequently meet in their daily transactions."

By section 1957 of the Code of Tennessee 1858 corporate bonds were made negotiable by statute.

It was held by this court in *Gilley* v. *Harrell*, 118 Tenn. 122, 101 S. W., 424, that the foregoing section of the Code was repealed, by implication, by the Negotiable Instruments Act, and thus it was inferentially held that the Negotiable Instruments Act applied to public and corporate bonds.

The bonds in question were, therefore, negotiable, and fall within the provisions of our Negotiable Instruments Act. Counsel for the defendant, however, insist that the *status* of the bank was not that of a holder in due course for the reason that it knew that Stone was the president of the defendant corporation and that he was hypothecating the securities of the corporation as collateral security to his individual notes, and that this was sufficient knowledge to put the bank upon notice.

Prior to the adoption of the Negotiable Instruments Act it was held in this, and other States, that one who receives from an officer of a corporation the notes or securities of such corporation, in payment of or as security for a personal debt of such officer, did so at his own peril. But this rule was changed by the Negotiable Instruments Act.

This court, in *Bank* v. *Butler,* 113 Tenn., 580, 83 S. W., 656, said:

"2. The contention of the defendant in error that Ward & Fryberg are not *bona-fide* purchasers, because while they had no actual knowledge that the check had been lost and was being fraudulently negotiated, the circumstances attending their purchase were calculated to excite suspicion and put an ordinarily prudent man upon inquiry which would have led to knowledge of the defect in the title of the holder, and this and their negligence in failing to require identification of their customer, charged them with constructive or implied notice of all the facts that inquiry would have developed, is also unsound and untenable, both in law and upon the facts disclosed in this record. The doctrine of constructive notice here insisted

upon, contrary to the rule administered in the courts of nearly all the States, and those of the United States and England, did obtain for many years in this State, and this court uniformly held that if a purchaser of negotiable paper had implied notice of prior equities or infirmities of any nature in the title of the holder from whom he purchased—that is, if anything appeared upon the face of the paper, or from the facts and circumstances attending its possession or sale, which would put one of ordinary prudence upon inquiry that would lead to actual knowledge of the equities or infirmities, he was bound to pursue such inquiries, and was charged with notice of the facts he could have learned. *Merritt* v. *Duncan,* 54 Tenn., 164, 19 Am. Rep., 612; *Hunt* v. *Sanford,* 6 Yerg., 387; *Van Wyck* v. *Norvell,* 2 Humph., 195; *Ryland* v. *Brown,* 2 Head. 273.

"The original rule governing the transfer of commercial paper, as first held in the courts of England and this country, protected the purchaser for value, in due course of trade, unless he had actual knowledge of the defects in the title of the holder or of facts which convicted him of bad faith in the transaction.

"This was held to be the law until in 1824, when Lord Chief Justice ABBOTT (Lord Tenterden), in the case of *Gill* v. *Cubitt,* 3 Barn. & Cress., 446, announced the principal that, although the holder had paid value for the instrument, yet, if he received it under circumstances which ought to have excited the suspicions of a prudent and careful man, he could not recover; and this case was followed by the courts of that country and some of those of America, but not without serious question, until 1834, when a return was had to the original rule by the courts

of England and the supreme court of the United States and a large number of the States, and since then it has been almost uniformly held in these jurisdictions that, in the absence of actual knowledge of defects in the title of the holder, the only question was one of good faith in the transaction, and negligence and want of diligence in ascertaining the previous history of the instrument were only circumstances to be considered in determining that question. Daniel on Negotiable Instruments, sections 770-775.

"This court, however, continued to adhere to the doctrine announced in *Gill* v. *Cubitt*, supra, and applied the rule of constructive or implied notice, until April, 1899, when it was abrogated, and what may be called the majority rule was adopted, by the enactment of the Negotiable Instruments Law, section 56 of which is in these words: 'To constitute notice of an infirmity in an instrument, or defect of the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.'

"This statute—the Negotiable Instruments Law—is a substantial reproduction of that enacted in the State of New York in 1896, and which has since been enacted in a majority of the States for the obvious purpose of securing uniformity in the law of commercial paper in all the states. Section 56 of our statute (Acts 1899, p. 150, chapter 94), above set out, embodies the majority rule upon the subject of notice as it has been held and administered by the courts of New York and other States

and the federal courts for many years.  This section has not been construed by this court, and what facts will constitute bad faith in the purchase of commercial paper has not been declared, but the question has frequently been before the courts in which the majority rule had obtained previous to the enactment of the statute in those jurisdictions; and the decisions of those courts in furtherance of the legislative policy to promote uniformity in the law of commercial paper are entitled to great weight with this court in interpreting the meaning of our statute.  These courts all seem to hold that the purchaser of a negotiable instrument owes no duty to the former holders to actively inquire into the title of the party in possession, and that circumstances of suspicion and gross negligence are not of themselves bad faith, but only evidence tending to establish it.  The rule is as stated in the leading case of *Cheever* v. *Pittsburgh, S. & L. E. R. Co.,* 150 N. Y., 65, 44 N. E., 701, 34 L. R. A., 69, 55 Am. St. Rep., 646, in these words: "There is not much difficulty in stating the rule of law defining the duties and obligations of a party to whom negotiable paper is presented for discount or sale before due.  He is not bound at his peril to be on the alert for circumstances which might possibly excite suspicion or wary vigilance.  He does not owe to the party who puts the paper afloat the duty of active inquiry in order to avoid the imputation of bad faith.  The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence.  The holder's right cannot be defeated without proof of actual notice of the defect in title or bad faith on his part, evidenced by cir-

cumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he has acted in *mala fide,* his title, according to settled doctrine, will prevail.' Citing *Magee* v. *Badger,* 34 N. Y., 249, 90 Am. Dec., 691; *Am. Ex. Nat. Bank* v. *New York Belting, etc., Co.,* 148 N. Y., 705, 43 N. E., 168; *Knox* v. *Eden Musee American Co.,* 148 N. Y., 454, 42 N. E., 988, 31 L. R. A., 779, 51 Am. St. Rep, 700; *Canajoharie Nat. Bank* v. *Diefendorf,* 123 N. Y., 202, 25 N. E., 402, 10 L. R. A., 676; *Vosburgh* v. *Diefendorf,* 119 N. Y., 357, 23 N. E., 801, 16 Am. St. Rep., 836; *Jarvis* v. *Manhattan Beach Co.,* 148 N. Y., 652, 43 N. E., 68, 31 L. R. A., 776, 51 Am. St. Rep., 727.

"In the case of *Swift* v. *Smith,* 102 U. S., 442, 26 L. Ed., 193, it is said: 'There is nothing in the case to show that Smith's purchase was not in good faith. There was nothing upon the note, nor anything in the indorsement thereon, to notify him that it did not belong to Jackson, both legally and equitably. It was a mercantile paper, and not due. One who purchases such paper from another who is apparently the owner, giving consideration for it, obtains a good title, though he may' know facts and circumstances that cause him to suspect . . . that the person from whom he obtained it. had no interest in it, or authority to use it for his own benefit; and, though by ordinary diligence he could have ascertained these facts, he can lose his rights only by actual knowledge or bad faith. It is true that, if the bill or note be so marked on its face as to show that it belongs to some other person than the one who offers to negotiate it, the purchaser will be presumed to have knowledge of the true owner, and its purchase will not be held to be *bona fide.*

"And in *Murray* v. *Lardner,* 2 Wall., 710, 17 L. Ed., 857, Judge SWAYNE, for the court, said: 'I believe we are all of the opinion that gross negligence only would not be sufficient where the party has given a consideration for the bill. Gross negligence may be taken as evidence of *mala fides,* but it is not the same thing. We have shaken off the last remnant of the contrary doctrine. Where the bill is passed to the plaintiff without any proof of bad faith in him, there is no objection to his title.'

"The text of the Cyclopedia of Law & Procedure, vol. 7, 944, 945, citing numerous cases decided by the supreme court of the United States, and those of last resort of States of Alabama, California, Colorado, Georgia, Illinois, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Missouri, Nebraska, New Jersey, New York, Ohio, Pennsylvania, South Carolina, Virginia, Connecticut, Delaware, Texas and Minnesota, states the law upon this subject thus: "The principle is now well established that neither the circumstances of defect of title, knowledge of circumstances which would excite suspicion in the mind of a prudent man or put him upon inquiry, nor gross negligence upon the part of the taker, will affect his right, unless the circumstances of suspicion are so cogent and obvious that to remain passive would amount to bad faith. In other words, the question is one of good or bad faith, and not of diligence or negligence, so far as the want of caution is material as bearing upon the question of good faith; and suspicions or knowledge of facts which falls short of bad faith do not amount to notice. In jurisdictions where this rule obtains, it is nevertheless held that, where circumstances are such as to justify the con-

clusion that the failure to make inquiry arose from a suspicion that inquiry would disclose a vice or defect in the instrument or transaction, such indorsee would be charged with knowledge.'

"We think the rule announced by the authorities is in accordance with the spirit and purpose of our statute, and supported by reason and justice, and we are content to follow it."

A case exactly in point is that of *Montvale* v. *People's Bank,* 74 N. J. Law, 464, 67 Atl., 67. The facts being that Crotty, as mayor of Montvale, executed certain improvement bonds which he retained in his possession as mayor. Subsequently, and without authority, he hypothecated a portion of these bonds to the bank to secure an individual loan. The city replevied the bonds. In disposing of the case the court said:

"What, then, are the rights, if any, under our statute of the defendant bank as the holder of these bonds? The fifty-second section of the act declares that 'a holder in due course, is a holder who has taken the instrument under the following conditions:

" 'I.   That it is complete and regular upon its face.

" 'II.   That he became the holder of it before it was overdue and without notice that it had been previously dishonored, if such was the fact.

" 'III.   That he took it in good faith and for value.

" 'IV.   That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it.'

"It appears from the agreed state of facts that the bonds are complete and regular upon their face; that the

defendant became the holder of them before maturity; that it took them for value; and that it had no knowledge until long after they came into its possession as collateral to the loan it had made to Crotty that the latter was not in lawful possession of them and authorized to dispose of them.

"It is suggested that, although the bank had no knowledge of any lack of authority on the part of Crotty to dispose of the bonds, the fact that he signed them as mayor charged it with notice of the defect in his title within the meaning of the fifty-second section of the statute. But it is provided by the fifty-sixth section of the act that 'to constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiable must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.' Knowledge on the part of the bank that the person to whom they made the loan was the mayor of the borough, if it had such knowledge, affords no ground for holding that its action in taking the bonds amounted to bad faith. Notwithstanding that Crotty executed them in his official capacity, he had as complete a right as any other citizen of the borough, or any member of the public at large, to become a purchaser of its securities, and the fact that he assumed to deal with them as his own in his traction with the bank, instead of being notice to it that he was betraying the trust reposed in him by the municipality and was fraudulently putting upon the market securities which had not been issued by it, justified the bank in believing that he was in fact just what he represented

himself to be by his conduct, namely, the owner of the securities. The bank is, therefore, the holder in due course of the bonds in suit, as such holder is defined by the statute.

"The rights of the holder in due course and the liability of the maker of a negotiable instrument which has been put into circulation by a person other than the maker and without the authority of the latter are prescribed by the sixteenth section of the act, which is as follows: 'Every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect thereto; as between immediate parties and as regards a remote party other than a holder in 'due course, the delivery, in order to be effectual, must be made either by or under the authority of the party making, drawing, accepting or indorsing, as the case may be; and 'in such case the delivery may be shown to have been conditional or for a special purpose only and not for the purpose of transferring the property—the instrument; but where the instrument is in the hands of a holder in due course, a valid delivery thereof by all parties prior to him, so as to make them liable to him, is conclusively presumed,' etc.

"Applying to the borough the conclusive presumption which the last-cited section of the statute prescribes for the protection of a holder in due course, it must be held to have made a valid delivery of these bonds, so far as the defendant bank is concerned, and the latter is therefore entitled to retain possession of them as outstanding obligations of the municipality."

In the instant cause the president, who negotiated the loans to the bank, testified, without contradiction, that he believed the bonds belonged to Stone, and made the loans upon the faith of the bonds.

We are, therefore, of the opinion that the bank was a holder in due course, and that the decree of the chancellor should be affirmed.