Alexander W. Pflueger, Appellee, v. Broadway Trust & Savings Bank, Appellant.

Gen. No. 34,732.

Heard in the first division of this court for the first district at the October term, 1930.

Opinion filed October 19, 1931.

DENT, DOBYNS & FREEMAN, for appellant.

FISHER, BOYDEN, BELL, BOYD & MARSHALL, for appellee; THOMAS L. MARSHALL and DAVID A. WATTS, of counsel.

MR. JUSTICE MATCHETT delivered the opinion of the court.

In an action of replevin for the recovery of three $1,000 debenture bonds issued by the Container Corporation of America on June 15, 1926, and due June 15, 1936, there was a finding for plaintiff and judgment for possession and costs in his favor, which defendant seeks to reverse by this appeal.

The declaration was in the usual form. There were pleas by defendant of not guilty, and a special plea alleging that the bonds were bearer bonds and nego-

tiable; that they were negotiated before maturity, and that defendant took the same without knowledge of any defect of title and became the holder thereof in due course.

There is no dispute as to any material fact. Defendant is engaged in the business of banking in Chicago. December 26, 1928, it accepted these debentures as collateral security for a seven-day loan of $2,500 made to a customer, Herbert Hoffmeyer, who gave his note for the amount of the loan which is unpaid. Defendant knew that Hoffmeyer was employed by a hotel near its place of business, and before accepting the debentures ascertained either by published reports or by inquiry that the debentures were selling at a price of par or better. The court found that in accepting the debentures defendant acted in good faith and was not negligent. The evidence further shows that plaintiff, who was the owner of the debentures, placed them in a safe at 111 West Washington street, from which they were stolen about April 9, 1928, by some unknown person or persons. Eleven days before the debentures were pledged to defendant they had been called for payment pursuant to the terms of a certain trust indenture executed by the corporation at the time the debentures were first issued. The first sentence of the writing on the face of each of the debentures is as follows:

"For value received, the Container Corporation of America (hereinafter referred to as the Company), a corporation organized and existing under the laws of the State of Delaware, promises *to pay to bearer,* or, if this debenture be registered, to the registered owner hereof, on June 15, 1936, the principal sum of One Thousand Dollars and to pay interest thereon from the date hereof at the rate of six per cent per annum, semi-annually, on December 15 and June 15 in each year."

Other provisions appear upon the face of the debentures to the effect that interest due before maturity

will be paid only on surrender of the interest coupons; that both principal and interest are payable at the office of the trustee in the Borough of Manhattan, city and State of New York, in gold coin, etc., "without deduction for any Federal Income Tax thereon or with respect thereto, not in excess of two per cent of such interest in any year, which the company or the trustee may be required or permitted to pay thereon or retain or deduct therefrom under any present or future law of the United States of America"; that the debenture is one of an authorized issue of $1,000,000, all issued under a certain trust agreement dated as of June 15, 1926, "to which trust agreement reference is hereby made for a statement of the terms under which the said debentures are issued, and the rights and obligations of the company, of the trustee, and of the respective holders of the said debentures under the said trust agreement"; that to the extent provided in the trust agreement all rights of action upon the debenture are vested in the trustee.

There is a further provision to the effect that recourse for payment of either principal or interest or for claim under the trust agreement may not be had or made against any incorporator, stockholder, officer or director of the company or of any successor corporation, either directly or indirectly by virtue of any constitution, statute, provision or rule of law, "all such liability being, by the acceptance of this debenture and as a part of the consideration for the issue hereof, expressly released, as provided in the said trust agreement."

Section 29 of the trust agreement states that except as therein provided, no holder shall have the right to institute any suit, action or proceeding at law or in equity upon or with respect to the agreement, or for the execution of any trust or power thereof, or for any other remedy under or upon the agreement or with

respect to any of the bonds or interest coupons secured thereby, without first giving to the trustee written notice of an existing default or tendering to the trustee security and indemnity satisfactory to it; nor also unless the holders of 25 per cent in the aggregate amount of the outstanding bonds shall have requested the trustee in writing to take action with respect to such default, and the trustee shall have declined to take such action or shall have failed to do so within 30 days thereafter, "it being understood and intended that no holder of any bond or interest coupon or claim for interest shall have any right in any manner to enforce any right or remedy hereunder, or under or with respect to any of the bonds, except in the manner herein provided, and that all proceedings hereunder shall be instituted, had and maintained in the manner herein provided, and for the equal benefit of all holders of outstanding bonds."

Each of the debentures provides that it may be redeemed at the option of the company upon any semi-annual interest date prior to maturity upon at least 30 days' prior notice published in a daily newspaper of general circulation, printed in the English language, published in the Borough of Manhattan, city and State of New York, at the price and upon the terms stated.

Section 14 of the trust agreement provides that notice having been given and cash for redemption deposited, "the said bonds shall, on the redemption date designated in such notice, become due and payable at the said head office of the trustee." There is a further provision that after the date fixed for redemption the bonds shall cease to bear interest.

Two controlling questions arise upon the record: (1) Are the debentures, which are the subject matter of this suit, negotiable? (2) Assuming negotiability, were the same overdue when received by defendant in the transaction in Chicago? If the same were not

negotiable or overdue at that time, then defendant would take the same subject to infirmities, not being a holder in due course; but if they were negotiable and not due, even a thief could give good title to one taking for value and in good faith. *Sherman State Bank v. Smith,* 244 Ill. App. 171.

Preliminary questions arise. Defendant contends that since the debentures were issued in New York and by their terms payable there, the laws of New York are to control our decision. Plaintiff, on the other hand, says that since the transaction in which defendant took the bonds occurred in Illinois, the laws of this State are controlling. In a suit in the State of Michigan involving debentures of this same issue and where identical questions were involved (*Paepcke v. Paine,* 253 Mich. 636, 235 N. W. 871), the Supreme Court of that State said it was conceded by the parties that the laws of the State of New York should be applied. The point is not conceded by these parties.

The question is of some importance since it is suggested that under the statutory law of the State of New York the debentures are negotiable (ch. 41 of the Consolidated Laws of New York, Article 8). The opinion in the Michigan case holding the law of New York applicable relies on *Fidelity & Deposit Co. of Maryland v. Andrews,* 244 Mich. 159, 221 N. W. 114, which so holds without the citation of authority. It further cites *City Bank & Trust Co. v. Atwood,* 197 Mich. 116, 163 N. W. 941, a case distinguishable upon the facts, since the action there was upon the written instrument.

While there is some conflict in the authorities, we are of the opinion that where, as here, the controversy is between the original holder and a third party claiming title to the debentures, the law of the jurisdiction wherein the transaction occurred through which the defendant claims title should be applied.

In *Picker v. London & County Banking Co.*, 18 Queen's Bench Div. 515, it appeared that the plaintiff brought an action to recover possession of certain Prussian bonds which were issued by the Prussian government and which had been stolen from the plaintiff. Evidence was offered tending to show that by the law of Prussia these bonds were payable to bearer and transferable by delivery, and that a bona fide holder for value without notice would be entitled to payment of them. The plaintiff gave evidence tending to show that in the English markets these bonds were by custom not negotiable. The trial judge held that the instruments were not negotiable and gave judgment for the plaintiff, which was affirmed upon appeal. Lord Esher, M. R., said: "But I will assume that they were negotiable instruments in Prussia in the fullest sense of the term. The question is, what under those circumstances is the English law with respect to them. The common law of England does not allow a party to a contract to transfer his right under the contract to another person except in certain cases. . . . If all that can be proved is that by the law or custom in Prussia the instrument is negotiable, then, as it seems to me, the answer is that an English Court and English merchants are not bound by a law or custom of trade in Prussia. To prove that an instrument is negotiable in the sense required, there must be something to make it so by English law." Fry, L. J., said: "I am of the same opinion. The question is whether these bonds are negotiable instruments according to the law of England."

In *Williams v. Colonial Bank*, 38 Chancery Div. Law Reports 388, where the question of the title to certain stock in an American corporation was at issue, Lindley, L. J., said that the evidence given by the American lawyers was to the effect that if the transaction had taken place in America the banks would have had a

good title to the shares, subject possibly to a question of attestation, and the banks would have succeeded. He added:

"Now, can it be said that these banks have acquired by English law a title to these certificates? If so, how have they got it? Assume for the moment that in *America* certificates indorsed like these are treated as negotiable instruments, that would not make them negotiable instruments in this country. That was decided by *Picker v. London and County Banking Company,* but authority is hardly wanted for so very obvious a proposition. A Prussian thaler is current in *Prussia,* but it is not current in *London;* nor, because a negotiable instrument is current in one country and part of the cash of that country, is it therefore a negotiable instrument or part of the cash of *England."* Bowen, L. J., said: "Whether or no they are negotiable instruments according to American law is unimportant if they are not negotiable instruments according to our own."

The same principle was expressed by Justice Holmes in *Direction der Disconto Gesellschaft v. United States Steel Corp.,* 267 U. S. 22, a case involving the title to shares of stock where the certificates had been seized by an English custodian of enemy property. He said:

"But the question who is the owner of the paper depends upon the law of the place where the paper is. It does not depend upon the holder's having given value, or taking without notice of outstanding claims, but upon the things done being sufficient by the law of the place to transfer the title."

In 2 Wharton on Conflict of Laws, ed. 1905, sec. 447b, p. 966, the author says:

"It may be pointed out in this connection, however, that according to the weight of authority, although there is some conflict upon the point, the negotiability of an instrument, as affecting the respective rights of

one who has been fraudulently deprived of it, and one who has obtained the same from or through a third person who had no authority to transfer it, depends upon the law of the place where the transfer to the present holder took place, and not necessarily upon the substantive law of the original contract." *Gorgier v. Mieville,* 3 Barn. & C. 45; *Lang v. Smyth,* 7 Bing. 284; *Goodwin v. Robarts,* L. R. 1 App. Cas. 476; *Picker v. London & County Bkg. Co.,* L. R. 18 Q. B. Div. 515; *Williams v. Colonial Bank,* L. R. 38 Ch. Div. 388, are cited to that effect, and *Wylie v. Speyer,* 62 How. Pr. (N. Y.) 107; *Savings Bank of Kansas v. National Bank of Commerce,* 38 Fed. 800, are cited as contrary. The authorities are also collected in a note to *Spies v. National City Bank,* 174 N. Y. 222, 61 L. R. A. 193, at p. 205, subdivision 8. See also *Alcock v. Smith,* L. R. 1 Ch. Div. 238; *Embircos v. Anglo-Austrian Bank,* L. R. 1 K. B. 677, and *Roland M. Baker Co. v. Brown,* 214 Mass. 196.

A writer on this subject in 11 Cal. L. R. pp. 115–117, says:

"What little Anglo-American authority there is upon this question seems to indicate that the original character of an instrument is generally held not to have been impressed permanently upon it, but that its negotiability as to persons dealing with the instrument within a jurisdiction other than that in which it was issued and made payable is to be determined by local law. . . .

"On the Continent, however, it is generally assumed that the law of the place of issue must fix the character of an instrument throughout its life." He cites Lorenzen, Conflict of Laws Relating to Bills and Notes, p. 131, and raises the question of whether *Popp v. Exchange Bank,* 189 Cal. 296, means that the courts of California have adopted "the continental rule."

We think the ''Anglo-American rule'' should be adhered to. It does not seem reasonable that the courts of this State should be required to apply to a transaction taking place within this State the rules of law of a foreign jurisdiction. Negotiable instruments are credit instruments and designed to take the place of and pass as money. It is not to be supposed that a sovereign State would adopt and enforce a rule of law which in its practical effect would subject transactions of this kind between parties in this jurisdiction to a foreign legislature. Since the transaction in which defendant took these bonds and by reason of which it claims title to them occurred within the jurisdiction of the State of Illinois, we hold the legal effects of the transaction must be construed according to the law of Illinois.

A further question is whether the negotiability of these debentures must be determined by their conformity or lack of conformity to the Negotiable Instruments Law. That law in substantially the same form was effective in both New York and Illinois at the time these debentures were issued. Professor Brannan thinks (see Brannan Negotiable Instruments Law Annotated, 4th ed., p. 7) that while the language of the act taken literally is broad enough to include bonds of this character, it should not be construed to include them. He points out that the legislators evidently had in mind only three types of instruments, namely, promissory notes, bills of exchange and checks. He says that bonds are not given any consideration except a reference in section 65 of the act which, he thinks, is too incidental to have the effect of invalidating instruments universally accepted as negotiable by the business world. (See Cahill's St. ch. 98, ¶ 85; Smith-Hurd's Ill. Rev. Stats., ch. 98, ¶ 85, sec. 65.) He says that while in some respects similar, the functions performed by bonds in the business world are quite differ-

ent from the functions of promissory notes, bills of exchange and checks; that it is unnecessary in the determination of the negotiability of bonds to refer to the formal requisites declared by the law for simpler instruments, since bonds and similar corporate securities before they are admitted for sale on the stock exchange must be passed upon by expert committees of such bodies who can apply the tests of transferability which are considered desirable. He points out that the British statute, while differing somewhat in its language from the American, is construed to be so limited, and says that our courts should be left free like theirs to follow commercial usage and to recognize the possibility of growth of the law merchant in the future as in the past; that "new types of corporate securities should be free to develop to meet the new needs of a changing business world"; that the law of commercial paper as embodied in the Negotiable Instruments Law was not something created by the judges of the courts, but represented the necessity of business worked out by business men.

So far as we are informed there has been no decision by the courts of review of this State as to whether the statute should or should not be limited to notes, bills of exchange and checks. However, cases cited in the briefs from this and other States in which the Negotiable Instruments Law has been enacted assume that it is applicable to obligations such as bonds and debentures. In *Manhattan Co. v. Morgan*, 242 N. Y. 38, the precise question was presented, and it was held that an instrument to be negotiable must conform to the statute. It was there said in substance that the section of the statute, which is section 65 of our act, precluded any other construction and that the act itself by its enumeration of qualities, which would make an instrument non-negotiable as well as its enumeration of qualities which would make it negotiable, made it impos-

sible to hold otherwise. (24 Col. L. R. 757; 39 Harv. L. R. 875.) The New York authorities, however, seem also to hold that the statute should be given a liberal construction to the end that instruments regarded by the business community as negotiable might be held to be so, and in *Manhattan Co. v. Morgan, supra,* the opinion indicated that notwithstanding the statute, instruments not otherwise negotiable might become so by contract or by estoppel. In *Enoch v. Brandon,* 249 N. Y. 263, the same court held that while an instrument to become negotiable need not follow any precise language, it must conform to the definition specified in the statute; that in the face of a command the court must adhere to the design of the legislature; that while at times contract rights might be enforced or some theory of estoppel adopted, no intention, no agreement "may make negotiable an instrument which the statute declares to be non-negotiable.' The particular instruments (bonds) involved in that case were held negotiable. We are disposed to follow the construction of the statute as announced in these New York cases. Indeed, the language of the Negotiable Instruments Law is so inclusive as to preclude a different construction. The word "instrument" in section 1, Cahill's St. ch. 98, ¶ 21, must be construed as broad enough to include bonds and debentures such as those which form the subject matter of this suit.

The authorities seem to agree that the question of negotiability must be determined from the face of the writing itself. That is practically the decision of our Supreme Court in *Equitable Trust Co. of New York v. Harger,* 258 Ill. 615, followed by this court in *National Bond & Investment Co. v. Lanners,* 253 Ill. App. 262; *Atlas Coal & Coke Co. v. Kentucky River Coal Min. Co.,* 253 Ill. App. 475; *Weber v. Keith Ry. Equipment Co.,* 248 Ill. App. 258, and *Balch v. English,* 261 Ill. App. 29. It is also the rule in New York (*Enoch v.*

*Brandon,* 249 N. Y. 263) as well as in Minnesota (*King Cattle Co. v. Joseph,* 158 Minn. 481, 488). *Nickey Bros. v. Lonsdale Mfg. Co.,* 149 Tenn. 1, 257 S. W. 403, 31 A. L. R. 1383; *Paepcke v. Paine,* 253 Mich. 636, 235 N. W. 871.)

The qualities which the statute prescribes as indispensable to the negotiability of written instruments are stated in paragraph 21 of chapter 98 (see Cahill's St. ch. 98, ¶ 21; Smith-Hurd's Ill. Rev. Stats. 1929) which is section 1, article 1, of the Negotiable Instruments Act. It provides:

"An instrument payable in money, to be negotiated, must conform to the following requirements:

"1. It must be in writing and signed by the maker or drawer.

"2. Must contain an unconditional promise or order to pay a sum certain in money.

"3. Must be payable on demand or at a fixed or determinable future time.

"4. Must be payable to the order of a specified person or to bearer; and,

"5. Where the instrument is addressed to a drawee, he must be named or otherwise indicated therein with reasonable certainty."

Paragraph 23 of our statute (section 3 of the act) provides:

"An unqualified order or promise to pay is unconditional within the meaning of this Act, though coupled with:

"1. An indication of a particular fund out of which reimbursement is to be made, or a particular account to be debited with the amount; or

"2. A statement of the transaction which gives rise to the instrument.

"But an order or promise to pay out of a particular fund is not unconditional." Cahill's St. ch. 98, ¶ 23.

Section 51 provides: ''The holder of a negotiable instrument may sue thereon in his own name. . . . '' Cahill's St. ch. 98, ¶ 71.

It is contended here that the promise in these debenture bonds is not unconditional, because of the provision recited by which the holder is referred to the trust agreement for a statement of the terms under which the debentures are issued and the rights and obligations of the company, of the trustee and of the respective holders, because all rights of action upon the debentures are vested in the trustee, and because the amount to be paid is rendered uncertain by the provision for the payment of taxes.

It has quite uniformly been held by the authorities in the different jurisdictions that if an extrinsic document is referred to on the face of the instrument in a way which modifies the unconditional promise to pay, then the negotiability of the writing is destroyed. If, on the contrary, its effect is simply to state the origin of the transaction out of which the writing arose, or if it simply refers to some other writing which provides additional security for the performance of the unconditional promise to pay, then such reference does not in any way affect or destroy the negotiability of the writing.

Thus, in Strand Amusement Co. v. Fox, 205 Ala. 183, 14 A. L. R. 1121, where upon the face of a promissory note in the usual form were written the words, ''as per contract,'' it was held by a divided court that the words did not impair the negotiability of the note. The annotation to this case says:

''It may be stated as the general rule that wherever a bill of exchange or promissory note contains a reference to some extrinsic contract in such a way as to make it subject to the terms of that contract, as distinguished from a reference importing merely that the extrinsic agreement was the origin of the transaction,

or constitutes the consideration of the bill or note, the negotiability of the paper is destroyed.''

In *Balch v. English,* 261 Ill. App. 29, this court said:

''The references on the face of the bonds to the trust deed amount to no more than a declaration and agreement by defendants that the bonds are secured by a first mortgage on certain real estate. To hold that these references made the bonds non-negotiable instruments would be to permit gross frauds to be perpetrated upon the public.'' Citing with approval *Utah Lake Irr. Co. v. Allen,* 64 Utah 511.

In *Enoch v. Brandon,* 249 N. Y. 263, the court said:

''If in the bond or note anything appears requiring reference to another document to determine whether in fact the unconditional promise to pay a fixed sum at a future date is modified or subject to some contingency, then the promise is no longer unconditional. (*Old Colony Trust Company v. Stumpel,* 247 N. Y. 538.)''

In *Old Colony Trust Co. v. Stumpel,* 247 N. Y. 538, the Court of Appeals affirming the Appellate division, held that an indorsement on the face of the note as follows: ''This note is given in accordance with the terms of a conditional sales agreement between the payee and the maker hereof,'' and the further indorsement on the back of the note, ''The within note is subject to the terms of a conditional sales agreement executed by the maker thereof upon this date,'' did not destroy the negotiability of the instrument.

In *Enoch v. Brandon,* 249 N. Y. 263, the bonds, after stating that the obligor must create a sinking fund to provide for the payment of the same as provided in the mortgage, said:

''To which reference is hereby made for a description of the property mortgaged and pledged, the nature and extent of the security, the rights of the holders of the bonds with respect thereto, the manner in which notice may be given to such holders, and the

terms and conditions under which said bonds are issued and secured.'' It was held that these limitations referred only to the rights of the parties under the trust agreement and did not limit or modify the obligation to pay and therefore did not destroy the negotiability of the bonds.

On the contrary, in *Babbitt v. Read,* 236 Fed. 42; *Crosthwaite v. Moline Plow Co.,* 298 Fed. 466, and *King Cattle Co. v. Joseph,* 158 Minn. 481, 488, substantially similar statements were held to destroy the negotiability of the instrument. In other words, while the cases do not differ very much in the statement of the rule of law, the application of it has led to uncertainty and confusion. For example, a corporate bond was held non-negotiable by the Supreme Court of California in *Kohn v. Sacramento Elec., etc., Co.,* 168 Cal. 1, 141 Pac. 626, while a similar bond was held to be negotiable by the Supreme Court of the State of Washington in *Bank of California v. National City Co.,* 138 Wash. 517, 244 Pac. 690. In the *Kohn* case the California court ruled that a reference to a trust agreement made a bond non-negotiable, and in *Old Colony Trust Co. v. Stumpel,* 247 N. Y. 538, a similar reference in case of a note was held not to make the note non-negotiable. In *Hibbs v. Brown,* 190 N. Y. 167, and *Enoch v. Brandon,* 249 N. Y. 263, it was held that such reference alone would not make a bond non-negotiable. In the *Kohn* case it was held that a provision exempting stockholders otherwise liable would render the bond non-negotiable, while in *Hibbs v. Brown* it was held that such provision would not render the bond non-negotiable. In other words, while practically agreeing upon the statement of the rule, the divers views as to its application to particular cases has left the law in a condition fitting the description of ''confusion worse confounded.'' A perusal of the opinions discloses that the courts are persuaded by what is conceived to be the

necessities of the situation. The tendency in the great commercial communities is to hold bonds and similar securities negotiable whenever it can consistently be done.

This court has passed upon a state of facts in *Weber v. Keith Ry. Equipment Co.*, 248 Ill. App. 258, which is substantially similar to that presented by this record. In that case plaintiff sued on certain bonds described as Keith Railway Equipment Company bonds which were in the usual form. Therein the Keith Company for value received promised to pay "to the bearer," and stated, "This certificate shall pass by delivery," and that it was one of a series of coupon certificates of the company. There was a clause providing for anticipatory redemption before maturity and another clause which stated that in case of default according to the terms of a contract of lease the principal amount might be declared due as provided by that contract. There was a provision on the face of the bond: ". . . to which contract of lease reference is hereby made for a statement of the nature and extent of the security afforded thereby, the rights of the holders of said certificates in respect of such security, and the terms and conditions under which said certificates are issued." The contract of lease provided: "No holder of any of the certificates herein provided for shall have the right to institute any suit, action, or proceeding, at law or in equity," etc.

The plaintiff sued at law on one of these bonds. The case was tried by a jury, and at the conclusion of the evidence each party made a motion for an instructed verdict. The defendant's motion was denied and that of plaintiff allowed. It was contended by the defendant that the provision on the face of the bond was sufficient to incorporate into the certificate itself all applicable provisions of the contract of lease, to which it referred, and that the effect of the provision in the

lease was to prohibit a suit at law upon the certificate unless such conditions had been complied with. To this contention plaintiff replied that the instruments sued upon were negotiable instruments, and that he was a holder in due course; that under the provisions of section 3 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 23, "An unqualified order or promise to pay is unconditional within the meaning of this Act, though coupled with: . . . a statement of the transaction which gives rise to the instrument."

The trial court held that the only question was whether the statement on the face of the bonds was sufficient under the decisions to require the plaintiff to examine and take notice of the contract of lease. The defendant offered in evidence this lease for the purpose of showing that the plaintiff was not entitled to maintain his action without complying with its provisions and stated that he, defendant, intended to offer proof of the amount of certificates outstanding at the time the suit was commenced, and of the fact that no written notice or request by the holders of the requisite amount of certificates had been made upon the trustee, and that no indemnity had been offered to the trustee as required by the lease. The court sustained an objection to this offer of proof and there was a finding for the plaintiff.

Upon appeal to this court it was held that the crucial and decisive question was whether or not the instruments sued upon were negotiable instruments, and on the authority of *Victor v. Warner*, 248 Ill. App. 35; *International Finance Co. v. Northwestern Drug Co.*, 282 Fed. 920, and other cases, this court held that the bonds were negotiable instruments, saying:

"There are several decisions in this State holding that the language used in a note or other commercial instrument will not have a tendency to destroy its negotiable character, unless by such terms payment is

dependent or conditional upon some instrument to which it refers. Among these cases are *Biegler v. Merchants' Loan & Trust Co.,* 164 Ill. 197; *Siegel v. Chicago Trust & Savings Bank,* 131 Ill. 569; *Hunter v. Clarke,* 184 Ill. 158; and *Zollman v. Jackson Trust & Savings Bank,* 238 Ill. 290.''

The court also said: ''The bank trustee, it is in evidence, sold to plaintiff the bonds in suit. The title by the bank's act of delivery passed to the purchaser plaintiff, and, at least inferentially, the conduct of the bank was notice to the plaintiff in making the sale that the instruments were negotiable. If they then believed they were not negotiable instruments, they were guilty of conduct which tended to deceive the purchaser in leading him to believe that he was purchasing negotiable instruments, when as now contended they were not so. Is it to be contemplated for a moment that plaintiff would have purchased the bonds sued upon, if the bank had told plaintiff at the time that the instruments were non-negotiable? We opine not.

''The setting forth in the instrument of the collateral security which secured the payment of the bonds in no way tended to affect or destroy their negotiability. The instruments sued upon, in themselves, are negotiable by their express terms to the point where there is a recital of the fact that they are secured by collateral partially therein described.'' The court said there were cases in the federal courts which held contrary but refused to follow them.

In *Paepcke v. Paine,* 253 Mich. 636, 235 N. W. 871, the court held negotiable debentures of the same issue as these for which plaintiff sues upon the theory that the reference in the debenture did not affect the unconditional promise to pay; that it merely gave notice to the holder that he might examine the trust agreement ''to ascertain the nature and kind of the security pledged to insure payment and the procedure provided

for to enforce the same, should he care to do so before making purchase thereof.'' The record before us does not disclose, however, that any security for the payment of these obligations was conveyed to or deposited with the trustee. Indeed, these instruments appear to be of the class described in Dewing's Financial Policy of Corp., p. 159, as ''straight credit obligations unsecured by any direct or indirect pledge of property.'' This case is distinguishable in this particular from many of the cases which have been cited, in that the obligation here is in effect simply an unsecured promissory note of the corporation.

The key to the solution of the question of the negotiability of these instruments is to be found, we think, in *Hibbs v. Brown,* 190 N. Y. 167. That case involved a controversy between the holder in good faith for value and without notice and the owner of certain coupons representing the interest upon bonds issued by the Adams Express Company, which was a joint stock association under the laws of New York. The bonds and coupons were of an issue of $12,000,000 secured by a trust indenture conveying and pledging for its payment a large amount of securities and property. Following the agreement in the usual form to pay to the bearer or registered holder, was a clause that provided:

''No present or future shareholder, officer, manager or trustee of the Express Company shall be personally liable as partner or otherwise in respect of this bond or the coupons pertaining thereto, but the same shall be payable solely out of the assets assigned and transferred to the said Trust Company or out of other assets of the Express Company.''

There were other clauses referring to the deed of trust for a statement of the rights of the bondholders. The trust indenture contained provisions that a certain proportion of the bondholders might waive default and

postpone payment of the interest coupons. The question to be decided was whether these limitations rendered the bonds and coupons non-negotiable. It was held that the same were negotiable but upon divers grounds, five of the seven judges of the court of appeals rendered opinions. Hiscock, J., said that to hold these instruments non-negotiable would be ''an unfortunate result'' and ''would make apparently negotiable securities in the hands of investors non-negotiable and seriously impair their value and security.'' He was of the opinion that the general credit of the obligor was pledged and that the instrument was therefore not subject to the objection that it was payable out of a particular fund. The other objections he thought ''minor reasons of a somewhat technical nature,'' and he would not accept the contention that the limitations of the document would prevent an action at law upon the bonds. He said: ''It would be somewhat extraordinary to construe the section as meaning that the character and standing of the claim being thus fixed, the association might then debar the holder from bringing such an action against it by an agreement which it had procured him to make to waive the individual liability, which otherwise might be enforced, and to bring his action against the association.'' He thought that such action at law could be maintained.

O'Brien, J., thought the instruments negotiable notwithstanding the limitations. He said that the argument against negotiability was that the bonds were the bonds of a partnership made in the name of a firm and though containing a promise to pay the bearer or holder a specified sum of money in the future upon a day certain, yet the promise was coupled with a condition that none of the partners should ever be held liable; that if the premises were correct, it would be difficult to resist the conclusion *''unless, indeed, it could be held that the conditions might be rejected as*

*utterly inconsistent with and repugnant to the promise and, therefore, void."* He thought, however, that the bonds were not in any proper or legal sense partnership obligations but that the Express Company must be regarded as a legal entity, whose general credit was pledged by the bonds.

Werner, J., did not agree with the views of his associates with reference to the liability of a joint stock company and said that the most distinctive difference between these corporate and noncorporate creatures of the law had been consistently preserved by the legislature and recognized by the courts. He thought that if the clause exempting the individual shareholders from liability was valid, the bonds were non-negotiable. He said that the clause was the only substantial thing differentiating these bonds from ordinary corporate bonds, and that there was great force in the suggestion that as a matter of public policy the exemption clause should be treated as nugatory so that the bonds might be invested with the element of negotiability, "which may fairly be regarded as one of the principal items of their value, and one of the most important inducements to their current sale and purchase." He added:

"I deem it unnecessary to go quite so far as that in the case at bar, since I am convinced that the exemption clause is so repugnant to the terms, tenor and purpose of the bonds that it not only may but must be taken out of the instruments in order to preserve their negotiability, and even their validity. It would be rather difficult to explain upon what theory the obligation of these bonds could be enforced in an action at law if the exemption clause is retained as part of the bonds. The maker cannot be sued in its business name, and the officers which represent it can only be sued upon obligations for which an action could be maintained against all the shareholders. (Code Civ. Proc., sec.

1919.) We are presented, in short, with the legal paradox that a written obligation, obviously intended to be negotiable, cannot be enforced in a court of law. This is an anomalous condition so utterly at variance with the manifest purpose of the association in issuing these bonds, and so palpably destructive of the legal rights of the holders thereof, that we could hardly give the exemption clause the effect which its language imports without destroying the validity of the bonds themselves.''

Bartlett, J., concurred in the opinion of Werner but said he could not agree with the suggestion that it was unnecessary to treat the exemption clause as nugatory as a matter of public policy; that he was of the opinion to hold otherwise would be subversive of the law of joint stock associations and permit them to exercise corporate powers and privileges without legislative sanction or restraint. One result, he said, would be to deprive creditors of their main security in many instances.

Cullen, Chief Justice, agreed with Werner that if the clause relieved the shareholders from personal liability it would render the bonds non-negotiable, and that he also agreed with him that ''such exemption clause is repugnant to the general tenor of the bonds which are intended to be negotiable and which have been purchased by the public as such and, therefore, *should be eliminated and disregarded.''*

Some of the points urged against the negotiability of these debentures require little, if any, attention. For instance, the provision that the interest will be paid without deduction for any federal income tax not in excess of two per cent of such interest in any year, does not render the sum to be paid uncertain, and the case of *Smith v. Myers,* 207 Ill. 126, relied on is easily distinguishable as are the other cases cited. (*Fidelity & Deposit Co. of Maryland v. Young,* 159 Ill.

App. 531; *First State Sav. Bank v. Russell,* 244 Mich. 298; 45 A. L. R. 1074–1108.) The provision is one that appears upon almost every bond and so far from rendering the amount to be paid to the owner uncertain, renders it certain. Nevertheless it seems plain that the holder of one of these debentures (if the whole writing is assumed to be valid) would not know his rights without recourse to the extrinsic document, namely, the trust agreement. Such seems to be the effect of the plain language on the face of the instrument—"To which trust agreement reference is hereby made for a statement of the terms under which the said debentures are issued, and the rights and obligations of the company, of the trustee, and of the respective holders of the said debentures under the said agreement." The writing upon its face does plainly refer to another document, and it does purport to take away the quality of negotiability by vesting the right of action upon the instrument in a trustee and not in a holder of the debenture, but this provision is so clearly contrary to the essence of the writing as stated in the first sentence and so clearly opposed to what any purchaser would regard as the evident general purpose of the document that we think it must be held to be void. That in our opinion was the basis for the decision in *Weber v. Keith Ry. Equipment Co.,* 248 Ill. App. 258, although not very clearly expressed. It is a general rule of law applicable in the interpretation of all contracts and one that is entirely necessary unless the perpetration of fraud upon purchasers and holders is to be encouraged. A provision of a contract contrary and repugnant to the essence of the contract is void. Thus, a release of one of two joint debtors retaining a right to proceed against the other, will be a discharge of both. (*Rice v. Webster,* 18 Ill. 331.) In *Benjamin v. McConnell,* 9 Ill. (4 Gilm.) 536, it was said: "A proviso in a contract totally repugnant to the contract

itself is void.'' A conveyance in fee with inconsistent limitation that the estate shall not be subject to the grantee's debts conveys the estate but the limitation is void. (*Hudson v. Hudson,* 287 Ill. 286.) Likewise void would be a subsequent condition that the grantee should not alienate the property during her lifetime. (*Walker v. Shepard,* 210 Ill. 100.) Particular clauses of a contract are subject to the general intent ascertained from the writing, and where in a chattel mortgage subsequent words appear sufficient to convey real estate, the later clause is repugnant and void. (*Harney v. Wirtz,* 30 N. D. 292.) An absolute gift by a testator cannot be cut down by a subsequent inconsistent or repugnant provision, and such subsequent provision is void. (*In re Valentine's Estate,* 204 N. Y. S. 284.) A provision in a contract repugnant to a right therein created is void. One cannot contract against his own fraud. (*Passaic Valley Sewerage Com'rs v. Holbrook, Cabot & Rollins Corp.,* 6 F. (2d) 721.) The same principle was applied to an insurance policy (*Jones v. Pennsylvania Casualty Co.,* 140 N. C. 262) and to a contract for the purchase of drugs (*Vickers v. Electrozone Commercial Co.,* 67 N. J. L. 665.) It has also been applied to the question of whether a contract constitutes a partnership (*Southern Can Co. v. Sayler,* 152 Md. 303) and to an agreement between parties for a settlement of claims in *DuPuy v. United States,* 35 F. (2d) 990.

This principle, which is of a so general application and so necessary to the attainment of justice in the construction of all contracts, should, in our opinion, be applied to a document of this kind, and we find nothing in the Negotiable Instruments Law which compels a construction to the contrary. The provisions of a negotiable contract giving to the holder the right to convey the title by delivery of the document and giving to the vendee the right to bring an action thereon, not

subject to defenses that might have existed in favor of prior parties, are of the essence of contracts which are intended to be used as instruments of credit which may pass current as money. For a debtor to be permitted in the first part of the writing to create an instrument with these qualities and to take it back in the latter part of the instrument, would be to open the door to fraud of a vicious kind. To permit a debtor to say in one part of his written obligation that he will pay and in another part that he will not pay, is something that the law will not tolerate.

We hold that these provisions which are contrary to the express promise made in the document and contrary to its entire tenor and purpose are void as against one holding in good faith for value.

It is urged however in behalf of plaintiff that this paper had matured by reason of the fact that a notice had been published prior to the time of its transfer calling it for payment, and that plaintiff was therefore not a holder of the debentures in good faith and for value before its maturity within the meaning of the Negotiable Instruments Act. Plaintiff has failed to recognize the distinction between maturity and redeemability. *Morgan v. U. S.*, 113 U. S. 476, is in our opinion conclusive against this contention. Defendant had no notice that these debentures had been called for redemption.

For the reasons indicated, the judgment will be reversed with a finding of facts and finding here of right of property and possession in defendant with judgment thereon. As the return of the sheriff shows that the property was taken under the replevin writ and delivered to plaintiff, the writ of *retorno habendo* will issue from this court for the return of said property to the owner, Broadway Trust & Savings Bank.

*Reversed with a finding of facts and judgment here with right of property and possession in defendant, with directions that the writ of retorno habendo issue.*

O'Connor, P. J., and McSurely, J., concur.

Finding of facts: We find as facts that the right of property and right of possession of the property which forms the subject matter of this suit is in defendant, Broadway Trust & Savings Bank; that said bonds or notes are negotiable instruments; that said defendant before and at the beginning of this suit was the bona fide holder of the same in due course for value without notice of any equities of plaintiff and that the writ of *retorno habendo* should issue from this court for the restoration of said property to defendant, Broadway Trust & Savings Bank.