Swesnik Loan Co., Inc., Appellant, v. Thomas J. Courtney, State's Attorney, Cook County, Illinois, and Eugene O'Connor. Florence V. Davis, Appellee.

Gen. No. 39,508.

Heard in the first division of this court for the first district at the June term, 1937. Opinion filed October 18, 1937.

WALTER A. ROONEY, of Chicago, for appellant; G. A. BURESH, of Chicago, of counsel.

McFARLAND, MORGAN & STEARNS, of Chicago, attorneys for appellee Florence V. Davis; LEONARD W. STEARNS, of Chicago, of counsel.

Mr. Presiding Justice O'Connor delivered the opinion of the court.

Plaintiff brought an action of replevin against Thomas J. Courtney as State's Attorney of Cook county, and Eugene O'Connor, one of his investigators, to recover two bonds of $1,000 each, the payment of which was secured by a mortgage on real estate. Afterward Florence V. Davis, by leave of court, intervened claiming the bonds. By order of court the bonds were turned over to the clerk of the court, there was a trial before the court without a jury, the bonds were awarded to the intervening petitioner, Davis, and plaintiff appeals.

The record discloses that plaintiff was conducting its business in Chicago as a pawnbroker, for which purpose it was incorporated under the laws of Illinois on September 14, 1933. It obtained a license from the City of Chicago to act as a pawnbroker, and on September 30, 1936, the two real estate bonds in question were pledged with it by one who gave his name as H. G. McCarthy, to secure the payment of a loan of $600.

The intervening petitioner purchased the two real estate bonds December, 1927, from the National Bank of the Republic. The bonds were executed by Griess Pfleger Tanning Co., a corporation, bore interest at 5½ per cent per annum, were due June 1, 1948, and secured by a first mortgage. The petitioner, from the time she purchased them until September 30, 1936, kept them in her safety deposit box in the National Bank of the Republic building. She testified that September 30, 1936, a man called at her apartment and said he was R. J. King, that he represented the Standard Oil Company and that the company wanted to buy a lease which she had on some property in Oklahoma; that he offered her "$20,000 and a percentage" for the lease; that he told her it would be necessary for her to put up some collateral with him as "security to guar-

antee that I owned this lease''; that she then went downtown with King to the safety deposit vault, obtained the two bonds and gave them to him; that he told her the bonds would be returned to her in about two weeks with a check for $5,000 as part payment of the purchase price of her lease. She never saw him afterward. A day or two thereafter she notified her attorney and he went to the State's Attorney's office where the matter was investigated, and shortly thereafter the bonds were given to the State's Attorney by plaintiff.

There is further evidence to the effect that plaintiff on the day it received the bonds, or the next day, made its daily report to the Police Department, as required by the Pawnbrokers' Act, which showed that the two bonds had been pledged with it as security for a loan of $600 by McCarthy of Kansas City, Mo.

David Swesnik, called by plaintiff, testified: ''I am of the Swesnik Loan Company, . . . I am in the pawn broking business and have been for the last twenty-seven years, on State street''; that about 3:30 in the afternoon of September 30th he received as a pledge the two bonds from a man who was introduced to him as Mr. McCarthy by a Mr. Abbot, with whom plaintiff had theretofore done some business; that he called up his broker to see if the bonds were good and was advised they were, and that he then gave McCarthy $100; that McCarthy said he was going home to Kansas City and told witness to pay the balance of the loan, $500, to Abbot, and that plaintiff did so, paying the amount in instalments over a period of about 10 days.

Counsel for petitioner say in their brief that the evidence ''clearly indicated that plaintiff acquired possession of the bonds in question under circumstances indicating that the same were not acquired by it in good faith.'' The record fails to disclose what the trial judge found on this question. So far as the record

shows, he did not give the reasons for his decision as he might have done. (Rule 1, this court, Rule 36, Sup. Ct.) But even if we assume the trial judge indicated that the plaintiff had not acquired possession of the bonds in good faith, this would not, as counsel for plaintiff say, be a sufficient defense, because, under the law, where one obtains a negotiable instrument before maturity and without actual knowledge of any infirmity or defect, his title cannot be defeated unless his action in taking it amounted to bad faith. Sec. 56, Negotiable Instruments Act (par. 76, chap. 98, Ill. State Bar Stats. 1935; Jones Ill. Stats. Ann. 89.076); *Funk v. Mid-City Trust & Savings Bank,* 260 Ill. App. 467; *Graham v. White-Phillips Co.,* 296 U. S. 27.

The intervening petitioner contends that whether plaintiff received the bonds in good faith is not controlling, for the reason that she is entitled to recover the bonds by virtue of sec. 9 of the Pawnbrokers' Act, and without the payment of any money advanced by plaintiff. That section provides: ''No pawnbroker shall take any article in pawn or pledge from any person appearing to be intoxicated, nor from any person known to be a thief or to have been convicted of larceny; and when any person is found to be the owner of stolen property which has been pawned, such property shall be returned to the owner thereof without the payment of the money advanced by the pawnbroker thereon or any costs or charges of any kind which the pawnbroker may have placed upon the same.'' Counsel say that under the express wording of the section a pawnbroker is required to return the stolen property. And that there is no dispute but that the bonds were fraudulently obtained from the intervening petitioner. On the other side, plaintiff contends that the word ''property'' mentioned in the section does not include negotiable instruments, because one may obtain a good title to a negotiable instrument from the thief, and the case of

*City of Chicago v. Hulbert,* 118 Ill. 632, is cited. It has long been firmly established that an innocent holder for value of a negotiable paper is protected though the one from whom he received such paper may have stolen it from the true owner, and this rule is founded upon principles of commercial policy. *Sherman v. Smith,* 244 Ill. App. 171; *Pflueger v. Broadway Trust & Sav. Bank,* 265 Ill. App. 569.

*City of Chicago v. Hulbert* (118 Ill. 632) was a proceeding brought in the criminal court against Hulbert to recover the penalty for failure to take out a license as a pawnbroker, as required by the city ordinance. Hulbert was found not guilty and the City prosecuted an appeal to this court. An examination of the records of this court discloses that to obtain a speedy decision from the Supreme Court the judgment by stipulation was affirmed *pro forma,* without opinion, and by the same order the case certified to the Supreme Court, where the judgment of the Appellate Court was affirmed, the court holding that Hulbert was not a pawnbroker within the meaning of the statute, and therefore not required to take out a license under the city ordinance. In the opinion the court quotes sections 1704 and 1705 of the city ordinance, the first of which provides that no person shall carry on "the business of a pawnbroker, loan-broker, or a keeper of a loan office, without being duly licensed, under penalty of $100"; the second section defines a pawnbroker to be "Any person who loans money on deposit or pledge of personal property, or who deals in the purchase of personal property, on condition of selling the same back again at a stipulated price, or who makes a public display at his place of business of the sign generally used by pawnbrokers to denote their business, to wit, 'three gilt or more or less yellow balls,' or who publicly exhibits a sign of 'money to loan on personal property,

or deposit or pledge,' is hereby declared to be a pawn-broker.''

The court there said (pp. 633–634): ''Thomas H. Hulbert, a resident of the city, a private banker, was, and still is, engaged in loaning money (both his own, and that of others on commission) on real estate and furniture, horses, wagons, machinery, warehouse receipts, etc., without removal from the possession of the owner, and also in loaning money on watches, diamonds and jewelry.'' The court then points out the method of doing business and says that, for example, one applying for a loan to Hulbert and offering a watch as security would be directed to have some reliable jeweler place a valuation on the watch, and if it were deemed good security for the loan the owner of the watch would be requested to store it in some warehouse, get a receipt for it and deposit it with Hulbert, and the borrower would then execute his promissory note for the amount of the loan. Continuing the court said (p. 635): ''From the foregoing facts the question presented is, whether Hulbert is liable to the penalty imposed by section 1704, *supra*.

''It appears from the stipulation found in the record, where the facts involved in the case have been agreed upon by the parties, that the defendant, Hulbert, is a private banker in the city of Chicago; that he loans money, for himself and others, on real estate and personal property security. We apprehend that a person may loan money in Chicago and take, as security, a mortgage on real or personal property, without incurring any liability under the ordinances of the city, or without becoming a pawnbroker. . . . But it is claimed that the defendant made loans and received personal property in pledge as security for the loan; that the warehouse receipts which were given to the defendant gave him the constructive possession of the property, and thus he may be regarded as one loaning on per-

sonal property actually placed in pledge,—in other words, that he may be regarded as a pawn-broker." The court then quoted section 1 of the Pawnbrokers' Act which is still in force and effect, which defines a pawnbroker to be "every person or company engaged in the business of receiving property in pledge, or as security for money or other thing advanced to the pawner or pledger, shall be held and is hereby declared and defined to be a pawn-broker." And the fact that the City counsel, by ordinance, defined a pawnbroker as a person engaged in a certain business did not make him such because the ordinance was contrary to the statute. And it was held that Hulbert was not a pawnbroker. In determining the meaning of the word "property"as used in section 9, the court said (pp. 636–637): "Lands are property, but it is plain they were not intended to be embraced in the word 'property' as used, because they are mortgaged almost daily as security for money loaned, and the person taking such security has never been regarded as a pawn-broker. Bonds and stocks and promissory notes could not have been intended, because they are pledged as security for money loaned by the banks all over the country, almost daily, and it has never been understood that our bankers are pawnbrokers. . . . We think the legislature intended by the use of the word 'property' to include only such articles of personal property as might be actually delivered over to the possession and custody of the person who advanced the money, and not stocks, bonds, notes or mortgages, or choses in action, or evidences of debt, . . . The defendant loaned a certain amount of money, for which he received a note payable at a certain time. To secure the note, the person who obtained the money gave as collateral security a warehouse receipt. If this transaction constituted the defendant a pawn-broker, every banker in the

State might be called a pawn-broker. All the banks, to a greater or lesser extent, make loans, and take as collateral, bonds, stocks, notes and mortgages, or warehouse receipts, and we think they have the right to do so without becoming pawn-brokers.''

What the court held in that case was that Hulbert was not a pawnbroker and was not required to take out a license under the terms of the city ordinance.

In the instant case, Swesnik, who represented plaintiff in the transaction, testified that plaintiff was operating as a pawnbroker; that he received the bonds as such, and that he made a report to the Police Department as required by the statute, showing that he had taken the bonds as such broker, and in this court contends that plaintiff had a right, under the Pawnbrokers' Act to take the bonds in question. Having received the bonds as a pawnbroker, and having complied with the provisions of the Pawnbrokers' Act with reference to making reports to the police, etc., plaintiff will not now be heard to say that it was not bound by the Pawnbrokers' Act, which requires that it return stolen bonds.

Plaintiff, having acted under the Pawnbrokers' Act, is bound by its terms and is in no position to invoke the rule for which it contends, viz., ''As between two innocent parties, where loss occurs, the intervening petitioner having placed it in King's power to perpetrate the fraud, the loss must fall on her.''

Nor is there any merit in plaintiff's contention that the intervening petitioner's testimony as to conversations between herself and King was inadmissible because made out of the presence of any representative of plaintiff. It was incumbent on the intervening petitioner to show that the bonds had been stolen from her by King or McCarthy. Obviously no one representing plaintiff would be present. The testimony as to the conversation was original testimony, clearly

admissible, and the rule contended for is in no way applicable.

The judgment of the municipal court of Chicago is affirmed.

*Judgment affirmed.*

McSurely and Matchett, JJ., concur.